```
1              IN THE UNITED STATES DISTRICT COURT
          FOR THE EASTERN DISTRICT OF VIRGINIA
2                    Norfolk Division

3

4  - - - - - - - - - - - - - - - - - -
                                    )
5    UNITED STATES OF AMERICA,      )
                                    )
6          Plaintiff                )    CRIMINAL ACTION NO.
                                    )    2:10cr170
7    v.                             )
                                    )
8    SHANITA R. LACY,               )
                                    )
9          Defendant.               )
  - - - - - - - - - - - - - - - - - -
10

11

12                 TRANSCRIPT OF PROCEEDINGS

13                    Norfolk, Virginia

14                      May 3, 2011

15

16  BEFORE:  THE HONORABLE HENRY C. MORGAN, JR.
            United States District Judge

17

18  APPEARANCES:

19          UNITED STATES ATTORNEY'S OFFICE
            By:  Robert J. Krask
20              Assistant United States Attorney
                Counsel for the United States
21
            FEDERAL PUBLIC DEFENDER'S OFFICE
22          By:  Rodolfo Cejas, II
                Assistant Federal Public Defender
23              Counsel for the Defendant

24

25
```

```
 1              (Hearing commenced at 2:36 p.m.)
 2              THE CLERK:  United States of America versus Shanita
 3     R. Lacy, criminal number 2:10cr170.
 4              Is the Government ready, Mr. Krask?
 5              MR. KRASK:  The United States is ready, Your Honor.
 6              Good afternoon.
 7              THE COURT:  Good afternoon.
 8              THE CLERK:  Defendant ready, Mr. Cejas?
 9              MR. CEJAS:  Yes, we are.  Good afternoon, Your
10     Honor.
11              THE COURT:  Good afternoon.  All right.  I
12     understand that there is some people that couldn't find seats
13     in the courtroom?
14              THE MARSHAL:  We are okay, sir.
15              THE COURT:  Is everybody in the courtroom now?
16              THE MARSHAL:  Yes, sir.
17              THE COURT:  Well, I see some people outside.
18              MR. CEJAS:  Your Honor, there are some additional
19     individuals but it is not absolutely necessary that they be
20     in here.
21              THE COURT:  What is that?
22              MR. CEJAS:  There are additional individuals who
23     have attended but it is not necessary for them to be inside,
24     Your Honor.
25              THE COURT:  All right.
```

```
 1              MR. CEJAS:  Thank you.

 2              THE COURT:  All right.  Is the Government ready to

 3      proceed?

 4              MR. KRASK:  We are, Your Honor.

 5              THE COURT:  Okay.  You can call the case.

 6              THE CLERK:  United States of America versus Shanita

 7      R. Lacy, criminal number 2:10cr170.

 8              MR. KRASK:  The United States is ready.

 9              MR. CEJAS:  The defendant is ready, Your Honor.

10              THE CLERK:  Thank you.

11              THE COURT:  Okay.  Let me see counsel and the

12      marshal at the bench, please.

13              (Side-bar conference.)

14              THE COURT:  I understand that you did not want the

15      victims seated in the jury box?

16              THE MARSHAL:  The victims, sir, I don't mind that

17      the victims just in case the lady comes --

18              THE COURT:  What is that?

19              THE MARSHAL:  I can come around.  Am I on

20      speakerphone?  I wouldn't mind the victims.  The problem is

21      the victim, if they are in the jury box, and the defendant

22      comes up to the podium, I just -- and the probation officer

23      is going to be there, as well, at the podium.

24              THE COURT:  I think it would be better for the

25      victims to be in the jury box than for the victims to be
```

1   surrounded by all these people that are here for the

2   defendant.

3           THE MARSHAL:  There is only -- that I'm aware of,

4   there is only six people that have arrived for the defendant.

5   There are still people outside.  I don't know who else is in

6   the jury box, if they are the defendant's family, but she

7   said she only had a few people here.

8           THE COURT:  I've got 50 people here on the list from

9   the defendant.

10          MR. CEJAS:  They are not all here, Judge.

11          THE COURT:  Who are all these people?  Are these all

12  victims or are they people for the defendant?  What are they?

13          MR. CEJAS:  The majority are for the victim.

14          MR. KRASK:  Four victims and the rest are for the

15  family.

16          THE MARSHAL:  I didn't know that.  They said all the

17  family wasn't here.

18          MR. CEJAS:  I'm sorry.  There was a

19  miscommunication.  My apologies.  You want me to, I can take

20  the four victims and put them in the jury box.  But there are

21  other people outside but there is a baby involved.

22          THE COURT:  I think you ought to do that.  I thought

23  they would be by the defendant's people, surrounded.  So I

24  think we should sit the victims in the back row of the jury

25  box.

1          THE MARSHAL:  Okay.  I don't know who they are.

2          THE COURT:  We can bring the rest of the people in

3    and fill up their space.

4          THE MARSHAL:  I don't know who the other victims

5    are, Your Honor.

6          (End of side-bar conference.)

7          THE COURT:  All right.  Mr. Cejas, in reviewing the

8    submissions in behalf of the defendant, it does not appear

9    that the defendant challenges the factual content of the

10   presentence investigation report as such.  She's simply

11   asking for a variant sentence from the guidelines?

12         MR. CEJAS:  That is correct, Your Honor.

13         THE COURT:  All right.  So she accepts that the

14   guidelines were accurately computed?

15         MR. CEJAS:  Yes, sir.

16         THE COURT:  All right.  You want to ask your client

17   to come forward to the podium and be sworn.

18         MR. CEJAS:  Your Honor, at this time I would like

19   the Court to affix the list, the notebook of exhibits that we

20   submitted, to the presentence report.

21         THE COURT:  You ask the Court to do what?

22         MR. CEJAS:  To affix the defense exhibits.  I

23   believe we submitted them in a notebook.  They could just be

24   included as part of the presentence report.

25         THE COURT:  Well, they are not part of the

1   presentence report but they are defendant's exhibits.

2               MR. CEJAS:  Oh, yes, sir, as an exhibit.

3               THE COURT:  I have what you submitted.

4               MR. CEJAS:  Thank you, Your Honor.

5               THE COURT:  All right.

6               (Defendant was sworn.)

7   BY THE COURT:

8   Q.  All right, Ms. Lacy.  Have you had an opportunity to

9   review the presentence report in your case?

10  A.  Yes, sir.

11  Q.  And have you had an opportunity to discuss that report

12  with your attorney, Mr. Cejas?

13  A.  Yes, sir.

14  Q.  And have you also discussed with him how the offense

15  conduct matches up with the guidelines which have been

16  recommended in your case?

17  A.  Yes, sir.

18  Q.  And based on that conversation, does it appear to you

19  that the guidelines were properly computed?

20  A.  Yes, sir.

21  Q.  And do you understand that the offense conduct to which

22  you have pleaded guilty resulted in -- well, the total amount

23  of the losses was in excess of $800,000?  Do you understand

24  that?

25  A.  I do, sir.

1   Q.  And do you understand that you're responsible for

2   repaying that to the victims of --

3   A.  Yes, sir.

4   Q.  -- the offense that you committed?

5   A.  I do.

6           THE COURT:  All right.  Mr. Cejas, when you reviewed

7   the presentence report and discussed it with your client, was

8   the content of the presentence report, as it related to the

9   offense conduct, consistent with your investigation,

10  discovery and conferences with your client?

11          MR. CEJAS:  Yes, sir, both mine and Ms. Allen who

12  had originally handled this case.

13          THE COURT:  All right.  And does it also appear,

14  from your conferences with your client, that her background

15  is correctly described in the presentence report?

16          MR. CEJAS:  Yes, sir, it is.

17          THE COURT:  All right.  And is the information about

18  both your offense conduct and your background properly

19  described in the presentence report, Ms. Lacy?

20          THE DEFENDANT:  Yes, sir.

21          THE COURT:  All right.  That being the case, the

22  Court's going to accept the factual content of the

23  presentence report as it relates to the conduct leading to

24  the felony charges against the defendant, and it's also going

25  to accept the information in the presentence report as it

1  relates to the defendant's background, and it will accept the

2  application of the guidelines to those facts.

3         Now, do you understand that the guidelines are not

4  binding on the Court, Ms. Lacy, and that the Court may impose

5  a sentence which is either greater or lesser than the

6  guidelines?

7         THE DEFENDANT:  I do, sir.

8         THE COURT:  Do you understand that the Court will

9  apply the statutory sentencing factors in determining your

10 sentence?

11        THE DEFENDANT:  Yes, sir.

12        THE COURT:  And do you understand that both the

13 defendant and the Government have the right to present

14 evidence relevant to sentencing at the hearing?

15        THE DEFENDANT:  Yes, sir.

16        THE COURT:  All right.  Then the Court's going to

17 accept the application of the offense conduct and the

18 background information regarding the defendant and its

19 application to the guidelines as well as the guidelines as

20 computed in the presentence investigation report.

21        The Government and the defendant will have an

22 opportunity to present evidence relevant to sentencing, as

23 well as argument, and when the Court has determined all of

24 the factual information necessary, it will determine a

25 sentence in accordance with the guidelines and the statutory

1   sentencing factors.

2          All right.  You may have a seat with your client.

3          MR. CEJAS:  Thank you.

4          THE DEFENDANT:  Thank you.

5          THE COURT:  All right, Mr. Krask.  Does the

6   Government have any evidence it wishes to present?

7          MR. KRASK:  No evidence, Your Honor.

8          THE COURT:  There is nothing from the victims?

9          MR. KRASK:  No, Your Honor.

10         THE COURT:  All right.  Mr. Cejas.

11         MR. CEJAS:  I have no additional evidence, Your

12  Honor, other than what has been submitted in the packet that

13  we submitted to the Court.

14         THE COURT:  All right.  Well, the Court has reviewed

15  the information that was submitted in the notebook prepared

16  in behalf of the defense as well as the information contained

17  in the presentence investigation report.  So if there's no

18  further evidence, the Court will hear argument from the

19  Government relative to sentencing.

20         MR. KRASK:  Your Honor, first, I would note that the

21  parties have submitted a proposed restitution judgment order

22  to the Court which is initialed and endorsed by the defendant

23  and counsel.  And also we have submitted a proposed consent

24  order of forfeiture which we would ask the Court to enter at

25  the appropriate time.

1          With respect to the defendant's request for --

2          THE COURT:  Well, just a second.  I have the

3    restitution order but I don't have -- I mean, the consent

4    order of forfeiture but I don't have a restitution order.

5          THE CLERK:  It is right up here, Judge.

6          THE COURT:  Did you put it on the bench?

7          THE CLERK:  Yes, sir.

8          THE COURT:  Okay.  That was not in the file that I

9    had before the hearing but it is here now.

10          All right.

11          MR. KRASK:  Thank you, Your Honor.  With respect to

12    the defendant's request for a downward variance, the United

13    States has filed a position paper opposing that.  I won't

14    belabor the grounds that we have offered in opposition to

15    that, but we do request that the Court deny any request for a

16    downward variance in this case.

17          I would like to now then discuss the Section 3553(a)

18    factors as they pertain to the advisory guideline range of 41

19    to 51 months and the proposed sentence that the United States

20    seeks.

21          With respect to the defendant's history and

22    characteristics, she is a 34-year-old woman with some college

23    education, and she is a mother of three teenagers, and she's

24    someone who the PSR indicates is hard working.  To her

25    credit, she falls into criminal history category one, but she

1   has been convicted of several driving offenses pertaining to

2   driving without a license, driving on a suspended license,

3   and the like.

4            Concerning the nature and circumstances of the

5   offense, the defendant comes before the Court today convicted

6   of a very serious offense.  Mortgage fraud, in and of itself,

7   is very serious, but the defendant was involved in a subset

8   of mortgage fraud known as foreclosure rescue, which is even

9   more serious than the typical mortgage fraud case, and which

10  in the context of the facts of this case, is especially

11  disturbing because it created three sets of victims.

12           The first set of victims is these homeowners who

13  were targeted by the defendant, most of whom were in some

14  financial distress at the time they were targeted, and who

15  were vulnerable.  The defendant sweet-talked them and

16  promised to help them resolve their financial problems, and

17  these people believed her.

18           And then the defendant did two things that were

19  simply unconscionable.  First, she robbed them of the equity

20  they had in their homes, and that equity totaled, Your Honor,

21  approximately $633,000.  Well, these people were in financial

22  distress, but they had equity in their homes, and they had a

23  financial asset upon which they could have relied before they

24  met Ms. Lacy.

25           The second thing she did was that she caused them to

1    lose their homes to foreclosure.  She promised to help them,

2    but, in fact, she set out to hurt them.  And they will have

3    to live with the consequences of the defendant's actions for

4    a long time to come, probably longer than any jail sentence

5    that the defendant will have to serve in this case.

6            Present today, Your Honor, we have Elaine Hill, one

7    of the victims in this case, and Delisa Mackey, one of the

8    homeowner victims in this case.  I'll talk about the other

9    two victims who are here also.  And the other two victims

10   fall into the second set of victims who were targeted by the

11   defendant.  These were people who agreed to buy the homes

12   from people such as Ms. Mackey and Ms. Hill.  And we refer to

13   them as investors, but I use that term loosely because these

14   weren't wealthy, sophisticated people who were sophisticated

15   about financial investments that Ms. Lacy was seeking to get

16   from them.

17           Instead, they were hard working people who had good

18   credit, who were specifically targeted by Ms. Lacy to fuel

19   her scheme.  She couldn't get her access to that equity in

20   these people's houses without finding people to say, yes,

21   I'll buy that person's house for a temporary period for

22   roughly one year.

23           And they were fooled by Ms. Lacy into allowing her

24   to use their good credit as part of this mortgage fraud

25   scheme.  And interestingly enough, the way they were fooled

1    and initially approached was through a proxy of Ms. Lacy, her

2    mother.  They knew her mother from church.  And they, like

3    many people in the mid- to late 2005, 2006, 2007 time frame,

4    enhanced their financial picture by investing in real estate,

5    and they were solicited to do that, and they agreed to do

6    that, and they, too, have been seriously harmed by Ms. Lacy's

7    actions.  And today we have Sandra Pitts here and Lisa Wilson

8    here also.  They were two of the investors at issue.

9         Of course, the last set of victims was the mortgage

10   companies that made $1.5 million worth of fraudulent mortgage

11   loans in the eight transactions before the Court today on

12   which the mortgage companies and the so-called investors have

13   lost over $880,000.

14        Now, the one aspect of the defendant's request for a

15   downward variance that I do want to address is this

16   suggestion that, well, this all happened in a very brief

17   period of time, and, gee, Ms. Lacy, you know, she started out

18   with the best of intentions, she really wanted to help these

19   people, and things just went seriously awry as a result of

20   the crash of the real estate market.

21        We would submit to the Court that that did not

22   happen, and we would ask the Court to reject any such

23   argument for three reasons.  The first is that prior to her

24   involvement in this scheme, the defendant worked in the

25   mortgage business for several years.  She wasn't someone new

1  to the mortgage field, who didn't really understand what she

2  was getting into.

3        From 2004 to 2007, when she got started with Clean

4  Slate Financial, she had worked in the mortgage field.  So

5  she knew how the system worked.  She knew what was to be done

6  to properly get mortgage loans to facilitate real estate

7  transactions.

8        Second, each of the eight mortgage loan applications

9  that the defendant and her proxies submitted was permeated

10  with fraud, whether it related to the asset information that

11  was reported for the buyer, the income information, the

12  information about whether the buyer intended to occupy the

13  home as a primary residence, or was purchasing it as an

14  investment property, and also at the closing table, the

15  information about who was bringing the funds to the closing

16  table.

17        The mortgage company would want and expect that the

18  buyer would be bringing certain monies to the closing table,

19  and typically in these transactions we are talking about 20

20  to $40,000, so that they have a stake in the mortgage loan

21  transaction.

22        In fact, Ms. Lacy was taking steps to disguise the

23  fact that the buyers weren't bringing money to the closing

24  table, that she was supplying it as part of this scheme.

25        And the third reason we would ask the Court to

1    reject the argument that this was simply a mistake or a

2    business venture gone bad was the defendant's dealing with

3    the victims.  I think there is a real dichotomy that comes

4    through in the presentence report and in the FBI agent's

5    interviews with all of these victims, and it's really the

6    before and the after approach that Ms. Lacy took to these

7    individuals.

8            Beforehand when she was trying to tap into their

9    equity, she was available to them.  She, you know,

10   sweet-talked them.  She indicated she would be there every

11   step of the way.  She would help them pay off their debts.

12   She would help them repair their credit history, and, you

13   know, magically, at the end of the year, they could buy back

14   their house, and they would be in a much better and more

15   sound financial position.  And the same thing is true with

16   the buyers.

17           Beforehand, you know, she needed their good credit.

18   She was available to talk to them.  She would take their

19   information, income information, employment information,

20   credit history information so that she could complete loan

21   applications for them.

22           She promised them that she would supply them with 12

23   months of mortgage payments so during this year that they

24   were doing this good thing to help out someone else, that

25   they wouldn't be financially accountable for these loans that

1    they were signing for.

2          And then after the transactions closed and after she

3    got the proceeds of that homeowner's equity out of each one

4    of these transactions, that $633,000, Ms. Lacy was nowhere to

5    be found, literally and figuratively.  They called and asked

6    to speak to her.  What are you going to do to follow through

7    on those promises?  She wasn't available.  Did she make a

8    couple payments here and there?  Yes, she did.  Maybe a

9    couple car payments in one instance, but by and large, she

10   wasn't around.  She didn't take their calls.  She didn't

11   provide the monies that she indicated would be used to pay

12   off debts, didn't provide the money that would be used to

13   pay -- make mortgage payments.  She was gone.  And she was

14   gone because of one simple reason; she had gotten what she

15   wanted out of the transaction and she no longer had any use

16   for these people who she defrauded.

17          These aren't the actions of someone who engaging in

18   good faith, who got caught in the crash of the real estate

19   market.  These are the actions of someone who was infected by

20   greed and a lack of concern for others.

21          The Court has received victim impact statements from

22   many of the victims, including some of the women who are here

23   to my right.  And the Court can understand the harm and the

24   consequences that Ms. Lacy has visited upon these people as a

25   result of this fraud.

1          So accordingly, the United States submits that this

2     is a case that requires a substantial sentence to punish the

3     defendant and promote in her a greater respect for the law,

4     to deter the defendant and others who in today's continuingly

5     struggling real estate market might be tempted to engage in

6     the same type of misconduct.  And for all of those reasons,

7     we seek a sentence on the high end of the advisory guideline

8     range of 41 to 51 months.

9          And lastly, I would note that with respect to any

10    term of supervised release, we would ask the Court to make it

11    a condition:  One, that she not engage in the mortgage

12    business and mortgage field, obviously; but two, because the

13    defendant holds insurance licenses with the Commonwealth of

14    Virginia and the State of North Carolina, that it also be a

15    condition of supervised release that she not engage in the

16    practice of or in the insurance field during any term of

17    supervised release because that would give her access to the

18    same type of personal information and financial resources of

19    others that she's shown that she cannot be trusted with.

20    Thank you.

21          THE COURT:  All right, Mr. Cejas.

22          MR. CEJAS:  Yes, sir.  Thank you, Your Honor.  Your

23    Honor, let me say, as the Court is well aware, we submitted a

24    lengthy position with respect to the sentencing factors, and

25    in light of that, I will do my best to make my comments

1   brief.

2          Let me just say at the outset, Your Honor, that I

3   take this matter very seriously, and I don't in my comments

4   want to suggest in any way that either myself, and certainly

5   not Ms. Lacy, that we do not understand, that she does not

6   understand that this is a very serious matter for which she

7   pled guilty.  I believe that she recognizes without any

8   question not only the nature of the offense but also the harm

9   that it has done to the victims involved.  I say that based

10  on my discussions with her, her discussions with Ms. Allen,

11  as well as what I know that she will say to the Court.

12         THE COURT:  Are the defendant's daughters present in

13  the courtroom?

14         MR. CEJAS:  I don't believe so.  They are.  I'm

15  sorry, two of them are, yes, sir.

16         THE COURT:  All right.

17         MR. CEJAS:  Your Honor, that said, taking all of the

18  factors into consideration, I believe, though, that even

19  despite the comments that Mr. Krask has made, that all of the

20  factors here point to a sentence below the recommended

21  guideline range.  Without going into too much detail again,

22  as you know, we outlined it in our position paper, the fact

23  that the activity was very brief, or relatively brief,

24  rather.  I believe it lasted no longer than eight months, the

25  fact that there was no obstruction of justice, no other

1    criminal conduct whatsoever while she has been on pretrial

2    supervision.  There hasn't even been a hint of a problem.

3         There is nothing to suggest that there is any

4    recidivism or any problems of that or that there will be any

5    problems in the future.  There are no substance abuse issues,

6    no hint of substance abuse issues ever.  I would note that

7    she is an educated woman.  As she stands before you she is a

8    hard worker, even as Mr. Krask noted that.  She has published

9    two articles, and she has been active in her community --

10        THE COURT:  One of the really unfortunate situations

11   here, Mr. Cejas, is that the defendant is obviously very

12   intelligent.  She's educated, she has experience, and she

13   could have earned an honest living to support her family.

14        MR. CEJAS:  Yes, sir.

15        THE COURT:  And she elected to be dishonest to the

16   detriment of all these people whose homes were lost.  And her

17   daughters ought to be sitting with the other victims because

18   they are victims of her greed.  That is what this whole case

19   is about, is about greed.

20        MR. CEJAS:  I don't dispute that, Your Honor.

21        THE COURT:  She could have and had earned a very

22   good living, and, in fact, apparently has earned a very good

23   living right now, and there was no need for this.  She

24   brought this terribly expensive home that was entirely out of

25   any reasonable range for what she was able to earn honestly

1   and put herself into a position where the only way she could

2   deal with it was to resort to defrauding people who were

3   already in distress and taking advantage of their distress to

4   satisfy her own greed.  That is what it's about.

5          MR. CEJAS:  Yes, sir.  Your Honor, I don't dispute

6   that.  And I understand the Court's sentiments as well as the

7   impact of this -- of this type of activity.  That said, I

8   still believe, Your Honor, as we cited in our position paper,

9   that it does warrant a sentence outside of the -- or below,

10  rather, the advisory guideline range.  I think the fact that

11  she will be adjudged a felon from this point on, and what

12  comes with that -- I know that that doesn't mean a lot to

13  many individuals, but it does mean a lot to her.

14         The fact that she will be losing the ability to

15  work --

16         THE COURT:  Eight months is a long time to be

17  perpetrating this very complex fraudulent scheme.  This is

18  not something that happened on impulse overnight.

19         MR. CEJAS:  I understand.

20         THE COURT:  Eight months is not a short time.  It is

21  a long time.  During that entire eight months she was

22  defrauding people on both sides of the scheme.

23         MR. CEJAS:  Yes, sir.

24         THE COURT:  The people who were in distress with

25  their mortgages and the people that she induced to invest

1    money in the scheme that was accomplishing nothing but

2    putting extra money in her own pocket.  And to do that for a

3    period of eight months is an extremely long time, not a short

4    time.

5              MR. CEJAS:  And I understand, Your Honor.  Again,

6    let me state, Your Honor, again, I don't believe that this

7    warrants a sentence that is suggested in the advisory

8    guideline range, and that is in spite of the fact that it is

9    very serious, to submit numerous cases, Your Honor, that

10   would support that, the case cited, the *Gaind* case from the

11   Southern District of New York, was cited at a downward

12   departure where part of the punishment was the loss of the

13   individuals' business and their ability to work.  The case

14   *Vigil*, which was from New Mexico, the case of *Darway*,

15   *Urbina* --

16             THE COURT:  What about these people that lost their

17   homes, Mr. Cejas?

18             MR. CEJAS:  Your Honor, I don't --

19             THE COURT:  There is a letter from one of her

20   daughters in what was submitted to me in support of her case

21   saying don't take my mother away from me.  Now, what in the

22   world is that about?  In other words, if the judge does his

23   or her duty in this case to impose a sentence commensurate

24   with the crime involved, the judge is the one who's taking

25   her children away from her.  She took her children away from

1    her.  She abandoned her children when she went into this

2    scheme, Mr. Cejas.  And to submit a letter to the Court

3    stating don't take my child away from me --

4          MR. CEJAS:  Your Honor, I believe that that letter,

5    along with any of the other letters of a similar nature --

6          THE COURT:  Yeah, there is another letter of a

7    similar nature from somebody involved in alternative

8    punishment.

9          MR. CEJAS:  I understand.  That said, Your Honor, I

10   don't have anything further to add.

11         THE COURT:  All right.  You want to come forward to

12   the podium with your client.

13         All right, Ms. Lacy.  You have an opportunity to

14   make an unsworn statement to the Court before the Court

15   pronounces your sentence.  You're not required to say

16   anything to the Court if you elect not to do so.  You may

17   consult with Mr. Cejas and seek his advice on whether it

18   would be advisable for you to make a statement, but the

19   decision must be made by you.  If you wish to make a

20   statement to the Court, this would be the time to do so.

21         THE DEFENDANT:  I do.

22         THE COURT:  All right.

23         THE DEFENDANT:  This allocution is presented in

24   respect of the Honorable Judge Henry Coke Morgan, Jr., and

25   all of the federal government representatives associated in

1   this matter.  My apology and expression of repentance is long

2   overdue.

3        Today, I offer no excuses for my actions.  I

4   apologize for it and request forgiveness of the matter

5   involving Shanita Renee Lacy and Clean Slate Financial

6   Services, LLC.

7        I am grateful for the opportunity to face the

8   victims, to make known my true and honest feelings of

9   unhappiness for my actions.  I know what I did was wrong.  I

10  know that I have messed up the life of so many others, and

11  this is not about me but about justice and financial

12  completeness for the victims.

13       I have created several layers of victims and I

14  address all impacted victims specifically.  The financial

15  institutions:  Bank of America, One West, GMAC Risk Cap and

16  City Mortgage.  I apologize to the institutions for the

17  disrespectful conduct and to each employee of those

18  institutions that may have suffered any loss of income or

19  benefit due to this situation.

20       The homeowners:  Ms. Barbara Ball, Ms. Carolyn Ball,

21  Ms. Christine Collins, Mr. John Coursey, Ms. Elaine Hill,

22  Ms. Delisa Mackey, Mr. Terry Purcell and Ms. April Wiggins.

23  You deserved assistance from an organization that was capable

24  to resolve your financial situations legally.  I will never

25  understand the effects that this incident has passed to your

1    lifestyle.  But if I could take your place right now, I

2    would.  I will never be able to fully compensate you for the

3    loss that you've suffered and the pain that you've endured.

4    But right now your benefit is my priority.  You deserve to be

5    made whole financially as soon as possible.

6         To the investors or the straw buyers:  Ms. Sandra

7    Pitts and Ms. Lisa Wilson.  I apologize for interrupting your

8    financially stable lifestyles with the possibility of

9    potential ruin.

10        The United States of America and my community, I

11   have denied important values and violated my moral obligation

12   as a United States citizen and as a member of the Hampton

13   Roads community.  As well, I apologize to anyone else

14   directly or indirectly affected by my foolish actions.

15        In regards to the one count of conspiracy to commit

16   mail and wire fraud, I will be eternally indebted to the

17   United States of America, the victims, and to my family.

18   While it is true, I have prepared this statement in part

19   because of the confinement exposure in connection to the

20   criminal felony charge, it is also true that I am sorry.  The

21   things that people say come from inside of them.  But after

22   all that I have done, I can only imagine how empty my words

23   will seem.

24        However, I attempt to share with you the true

25   despair that rides within my heart.  I will expose the

1   feelings of my heart.  In the moments when I spend time

2   alone, and my mind wanders, I've realized just how bad I have

3   messed up.  I realize just how bad I've hurt the victims and

4   all of their family.  My heart feels sorrow and it hurts me

5   that I have hurt people in this way.

6          Even as time passes, it still feels like just

7   yesterday, knowing what I have done, swings a very heavy

8   burden.  I'm convinced that this will haunt me for the rest

9   of my life.  I am embarrassed by my actions of offering false

10  promise to foreclosure rescue and financial well-being.  I

11  was totally out of control and disobedient to everything that

12  I was taught as a child.  This was never personal.  It was

13  self-inflicted.  And even I'm devastated by my actions.  I

14  publicly express to you just how remorseful I feel.  I'm

15  sorry.

16         I am sensitive to each and every victim's pain and

17  suffering and do not view this crime as harmless, minor or

18  emotionless.  Actually, I hate that I have done this to you.

19  I have made a mess of the life of so many people.

20         I have a moral obligation and a financial obligation

21  to every victim and I will achieve wholeness for each one of

22  them.  Therefore, I admit guilt to the charge and accept full

23  responsibility for the catastrophic experience.  Apologies

24  never have the power to erase the effects of such devastation

25  but I want the Court to know my heart is concerned for the

1    victim's well-being.

2         I do know that my formal public apology and even

3    punishment will by no means provide sufficient reimbursement

4    for the chaos resulting from my actions.  I was selfish and

5    out of control, but I will strive to make each victim whole

6    through restitution.  Certainly, my criminal actions is not

7    worthy of leniency.

8         As I posture myself to request mercy and leniency

9    from the Court regarding confinement, I do so with respectful

10   words, a repentant heart, purified motives and a

11   rehabilitative mind.  I stand before you today not to make

12   excuses but to make reimbursement my priority.  My motives

13   have been purified.  My heart is filled with goals to repair

14   this situation for everybody.  I will reimburse the victims

15   for their financial loss and satisfy my moral obligation for

16   their justice.

17        My priority over my own desires is to take every

18   possible step to correct this.  I'm convinced that the

19   physical and emotional pain associated with this has changed

20   their lives and will change their life forever.  But we are

21   each responsible for our own conduct.  Therefore, I offer no

22   excuses for my actions, and I publicly request forgiveness

23   and mercy.  I understand the options for discipline that are

24   associated with this charge, the fines, the restitution, the

25   confinement and even the supervised release.

1            I am fully aware of the sentence range and the

2    federal sentencing guidelines' recommendation of 41 to 51

3    months of confinement.  This will haunt me for an eternity

4    with or without incarceration.  No discipline is enjoyable

5    while it's happening.  It's painful.  But afterward there

6    will be a peaceful heart of right living if you are trained

7    in this way.

8            This situation has given me cause for deep

9    self-examination and life reflection.  I have learned

10   countless valuable life changing lessons, and I know that I

11   have a lot of work to do in society, foremost to refund the

12   victims, deserve restitution.  I will help women both inside

13   and outside of the prison walls.  I will also mentor youth to

14   prevent as many of them that I can from standing where I find

15   myself today.

16           I will not get tired of doing what is good and will

17   dedicate my life to sharing positive, valuable information

18   with citizens' backing resources.  I will live a

19   rehabilitative lifestyle.  I will demonstrate a

20   rehabilitative lifestyle, and I will do that regardless of

21   any confinement issue during this sentencing today.

22           Through research I do understand what the federal

23   prison has to offer, the program that they have established

24   for a corrective lifestyle such as educational and vocational

25   training, health and fitness programs and religious groups.

1   Your Honor, if my actions result in physical incarceration, I

2   will become involved in everything that I need to live a

3   fully corrected lifestyle.

4          Immediately upon release, I know that it will be --

5   I know that I would have to seek counseling for myself and

6   for my children and for a successful functioning in society.

7   Through the strong pastor of my church and accountability

8   partners, several who are present with me here today, I have

9   a life plan to live as a responsible citizen of the United

10  States of America.  I will be a lifetime learner and an

11  advocate for criminals and for youth.  My life will eternally

12  yield only positive output and respect to my community, my

13  family, the United States of America and myself.

14          This statement of apology and repentance is

15  presented in part to my level of punishment, but first it's

16  my moral obligation to each victim that I have created.  They

17  need to be healed and they need to recover from this.  For

18  now the most important effort for me is to begin correction

19  through restitution to the victims.

20          I have been humbled.  My motives have been purified.

21  I have a repentant heart.  My mind is rehabilitated and

22  focused on correcting this situation for each and every

23  victim.  I have apologized to my family.  I have apologized

24  and asked forgiveness of God, my parents, my parents-in-laws,

25  my siblings, my siblings-in-laws, my children and my husband,

1    as well to my accountability partners, those that have been

2    here to support me.

3           I furthermore apologize to you, Judge Morgan, for

4    the need to stand here in your courtroom and to bring this

5    matter before you for sentencing.  I tell myself we are each

6    responsible for our own conduct.  I offer no excuses for my

7    actions, and whatever I could do to erase the despair, I am

8    willing.  I will never take lightly my required financial

9    obligation to each impacted victim.

10          I understand that actions matter and not words, and

11   today I make the first payment towards my restitution in the

12   amount of $800.  My household budget is prepared to make

13   minimum payments of at least $200 a month.  Sir, I will labor

14   to repay.  I will break my back, and I will work harder than

15   I ever have to make each victim whole.

16          I pray God's blessings on each and every one that

17   was impacted directly or indirectly.  I apologize for my

18   actions, and at this moment I submit to the authority that

19   governs my life forever more.  Thank you.

20          THE COURT:  Well, one of the victim impact

21   statements that was submitted to the Court as part of the

22   presentence investigation report states, in part, as follows:

23   J.C. was forced into early retirement due to multiple

24   sclerosis which left J.C. blind.  J.C. specifically purchased

25   the property in Maryland because it was a single-family home,

1    and J.C.'s mobility had been affected by the multiple

2    sclerosis.  J.C. is currently in the property -- that was at

3    the time this was written.  I don't know if it is still

4    true -- but the property is in foreclosure status.  J.C.

5    cannot put into words how devastating this has been.  J.C.

6    indicated how difficult it will be to obtain a new residence

7    due to failing health.

8            J.C. indicated the defendant has not apologized for

9    her actions, and her deeds speak about her character.  J.C.

10   indicated that at the age of 58 and in failing health, J.C.

11   will never recover from this incident.  The apology would

12   have been more persuasive had it been made to the victim

13   before today.  The Court hears a lot of apologies and

14   promises on the date of sentencing.

15           As far as making restitution is concerned, the

16   victims who lost their homes lost $633,000 in equity, and

17   their total losses exceeded $800,000.  At the rate of $200

18   per month, let's see, that would be 4,000 months to pay

19   $800,000.  As far as restitution is concerned, I hope that

20   you will be successful, but it will never be completed at

21   that rate.

22           It's unfortunate, as the Court said before, that a

23   person with the obvious intelligence and articulate way of

24   speaking that you have could have been very successful in any

25   number of honest pursuits, and the fact that you chose to

1   proceed illegally and inflict so much damage on so many other

2   people, which can never be repaired, is unfortunate.  But

3   it's not unusual in this type of case because the people who

4   have the intelligence and ability to commit this sort of

5   offense are most always able to earn an honest living without

6   having to resort to this.

7          But somehow they are overtaken by greed, and I hope

8   the lesson that your friends and your family and your

9   children can learn from this is that here is a very capable

10  person who was consumed by greed and so seriously damaged her

11  life and the life of her children, in particular, and her

12  family in general.

13         I've read these submissions, and a lot of which were

14  from young children who are still in school, stating that you

15  had been a good influence on them.  And I hope that the young

16  people in particular can learn from this, that there is no

17  need to resort to this sort of conduct to further themselves.

18         You could have done very well just working at the

19  regular jobs that you had worked with before and after this

20  incident without ever becoming involved in it.  But you did.

21  And the Court has to punish you in accordance with what you

22  did.  The Court can never make a determination that a person

23  is a good person or a bad person.  I'm sure you've done a lot

24  of good things.  You've got all kinds of letters and all

25  kinds of friends here to support you stating all the good

1   things you've done, and I'm sure you've done a lot of goods

2   things.

3           But when you commit an offense like this which

4   causes so much harm to so many other people, the Court has to

5   punish you in accordance with what you did.  It has nothing

6   to do with what kind of person you are.  The Court really

7   doesn't know what kind of person you are.  There is no way I

8   can know that based on -- even though I have a complete

9   report on you and all these letters, I can never know that.

10  I have to punish you for what you did.  And what you did

11  deserves very severe punishment.

12          Pursuant to the Sentencing Reform Act of 1984, it is

13  the judgment of the Court that the defendant, Shanita R.

14  Lacy, is hereby committed to the custody of the United States

15  Bureau of Prisons to be imprisoned for a term of 48 months.

16  Because of the defendant's family obligations, the Court will

17  order that the defendant remain free on bond under the same

18  conditions until 2 p.m. on June 3rd, 2011, at which time she

19  shall report to the United States Marshal's office in this

20  courthouse or to such other institution as she may have been

21  designated prior to that date.

22          Upon release from imprisonment, the defendant shall

23  be placed on supervised release for a term of five years.

24  Within 72 hours of her release from custody from the Bureau

25  of Prisons, the defendant shall report in person to the

1    probation officer in the district --

2         THE COURT:  Marshal, don't let anyone else leave the

3    courtroom during the Court's pronouncing sentence -- shall

4    report in person to the probation officer in the district to

5    which the defendant is released.

6         During her period of supervised release, the

7    defendant shall refrain from the unlawful use of any

8    controlled substance and submit to one drug test within 15

9    days of her release onto supervised release and at least two

10   periodic drug tests thereafter as directed by the probation

11   officer.

12        The defendant shall not incur any new credit charges

13   or open additional lines of credit without the approval of

14   the probation officer.  The defendant shall provide the

15   probation officer access to any requested financial

16   information.

17        The defendant shall participate in a program

18   approved by the United States Probation Office for financial

19   counseling.  The cost of this program is to be paid by the

20   defendant as directed by the probation officer.

21        The defendant shall apply all monies received from

22   income tax refunds, inheritances, judgments, and any

23   anticipated or unexpected financial gains to the outstanding

24   court-appointed financial obligation.

25        The defendant is prohibited from being

1   self-employed.  She is further prohibited from engaging in

2   any aspect of the real estate, mortgage or insurance industry

3   during her period of supervised release.

4           The defendant shall not be employed in any capacity

5   where she has access to personal and financial information of

6   others.  Considering the losses sustained by the victims and

7   the defendant's negative net worth and the restitution

8   obligation of the defendant, the Court finds that the

9   defendant does not have the ability to pay the minimum fine

10  or the cost of her imprisonment or the other cost of her

11  supervised release.

12          The defendant shall be required to pay restitution

13  in the amount of $883,002.47.  The defendant has stated that

14  she thought she could pay $200 per month, and the Court will

15  accept that.  It's difficult for somebody to, with her

16  obligations, to pay a good deal more than that, and even

17  though it will take a long time, if ever, to repay the

18  restitution at that rate, there is no reason for the Court to

19  set restitution at a figure which is not achievable.

20          So those payments will begin 60 days after her

21  release from confinement.  I'll ask counsel and the defendant

22  to initial Paragraphs 4 and 7 where the Court has made the

23  additions to the proposed restitution order.

24          MR. CEJAS:  Your Honor, will the Court include in

25  its judgment a recommendation to the Bureau of Prisons that

1    she be permitted to serve her confinement at an institution

2    as close to her home as possible?

3              THE COURT:  Yes.

4              MR. CEJAS:  Thank you.

5              THE COURT:  The unfortunate -- one of the most

6    unfortunate parts of any sentencing situation such as that

7    faced by the defendant is that her children are punished by

8    her misdeed, and the Court does that for the benefit of her

9    children.

10             So the Court will recommend that she be confined to

11   an institution as close as possible to the residence of her

12   children, and I know that that is going to be a difficult

13   issue.  I think they want to stay in Virginia, if they

14   possibly can.  I'll ask the clerk to mark the restitution

15   order filed.

16             We also have a consent order of forfeiture which

17   orders that any money traceable to her misconduct up to

18   $1,547,172 be forfeited to the United States.  And this order

19   has been signed by the defendant as well as counsel.  Does

20   your client understand that this order is also going into

21   effect, Mr. Cejas?

22             MR. CEJAS:  Yes, sir.

23             THE COURT:  All right.  Well, the Court will also

24   enter this order effective today.  I'll ask the clerk to mark

25   this order filed.  So the Court is ordering that the fine and

1    the cost of imprisonment and the other cost of supervised

2    release be waived other than that which the Court ordered her

3    to pay in connection with financial counseling.

4         However, the defendant shall also be required to pay

5    a special assessment in the sum of $100, which is due and

6    payable immediately, and if not paid prior to her

7    surrendering to the U.S. Marshal, then it will be deducted in

8    installments from her prison account in accordance with the

9    rules and regulations applicable to such accounts.

10        All monies payable to the victims shall be divided

11   pro rata among the victims and distributed to them by the

12   agency collecting the payments.

13        All right.  This was a one count criminal

14   indictment, and the defendant waived the right to appeal her

15   sentence in the plea agreement, Mr. Cejas.  If she indicates

16   to you that she has the desire to appeal her sentence,

17   notwithstanding the provisions of the plea agreement, then

18   you should file a notice to protect her timeliness of her

19   efforts to appeal, and if she is unable to afford an

20   attorney, then an attorney will be appointed for her for that

21   purpose.

22        MR. CEJAS:  Yes, sir.

23        THE COURT:  It will be necessary that you meet with

24   your probation officer prior to departing the courthouse

25   today because you are remaining under bond until you are

1    ordered to surrender to the United States Marshal, which the

2    Court is doing, as I said, for the benefit of your children.

3    And if you fail to appear at that time, I'm relying on the

4    fact that you will appear because you've obeyed the

5    conditions of your bond up until now and you have connections

6    to the community.

7            So that's why the Court is granting this, so that

8    you can attempt to make arrangements for your children.  But

9    if you fail to appear, not only is that a violation of the

10   terms of your bond, but it's a separate offense against the

11   United States.  Do you understand that?

12           THE DEFENDANT:  Yes, sir.

13           THE COURT:  All right.  Mr. Cejas, you may have a

14   seat with your client.

15           (Hearing adjourned at 3:40 p.m.)

16                         CERTIFICATION

17

18       I certify that the foregoing is a correct transcript

19   from the record of proceedings in the above-entitled matter.

20

21

22       X_____/s/_____x

23                   Jody A. Stewart

24                   X_____6/15/201_____x

25                         Date

JODY A. STEWART, Official Court Reporter